The second case this morning is 22-30053, Dawson-Valdez v. Crown Equipment Corporation. Mr. Warshower, did I pronounce that correctly, I hope? You did. May it please the court, my name is, as the court just pronounced, Michael Warshower, and I represent the plaintiff. We start with the statute. The part relevant here is simple. A product is unreasonably dangerous in design if, at the time it left the manufacturer's control, there existed an alternative design that was capable of preventing the damage. Given the record in this case, the only way this judgment can be affirmed is for this court to agree that the district court can add words to this statute where none are needed and create public policy expanding the statute without a reason or a source. The district court expanded the Louisiana Product Liability Law Act in two ways. First, it required the plaintiff to choose one singular specific best design, to commit to one. Defendant agrees that the LPLA allows the plaintiff to offer as many alternatives as they like. So if the plaintiff's interpretation, and we believe this court's interpretation of the district court's order, was indeed to demand that the plaintiff choose one of the multitude of fully developed alternatives that are in the record, that alone demands reversal. Second, the district court required a level of specificity that is not in the statute. A level of specificity that is not found in the Louisiana jurisprudence, or even in the sources relied upon for the basis for the statute at issue. The district court, creating a discretionary moving goal post, demanded drawing specifications in detail that are not in the statute or demanded by Louisiana's courts. Two rules relevant to deciding what this simple statute means should be considered. The first, you know, we've been talking about the Supreme Court this morning, and I certainly don't in any way profess to be an expert on it, nor can I candidly admit that I've read this whole book. But two of my law partners have read the whole book, and they wanted me to share something with you. Justice Scalia writes, it's one of the most important canons in reading law, the interpretation of legal text, the following. Nothing is to be added to what the text states or reasonably implies, casus omesis pro omiso habitus est. That is, a matter not covered is to be treated as not covered. The second interpretation rule is the Erie Doctrine. The interpretation and application of law for a case pending in the United States District Court by virtue of diversity jurisdiction should be the same as the state court would have done. In fact, in a matter involving this same statute, the Louisiana Product Liability Act, as recently as January of this year, this court, being unclear how the Louisiana Supreme Court would have interpreted the LPLA, certified a question to it, and so it was Seguin v. Roomington Arms. Indeed, my co-counsel is on that case. In that order, the court noted, when deciding issues of state law, this court must consider how the state's highest court would decide those issues. This court is required, I quote, to follow the rule we believe the Louisiana Supreme Court would adopt. In making Erie guess, our Erie guess, we consider, among other sources, treatises, decisions from other jurisdictions, and indeed, the majority rule. We may also consider Louisiana public policy interest, if the rest doesn't solve that problem. Could I ask just a couple questions? Absolutely. If the court let you look at, evaluated three designs, then how does that fit with it required you to have only one design? I don't think that it actually did that. Because when I look at the court's opinion, it's attractive to think the court did that? Well, it has the three. It does, but I think that was merely to show that, look, here's all the designs the plaintiff identifies. Still won't choose one. I think it was used to compare and contrast what we did, which was lots of alternatives, with what it wanted us to do. I can't help but look at the court's opinion. Specific single design appears in one phrase or another on page 4, 13, 15, 17, 19, 21, 22, 23, 24, 26, 27, and 29. Words matter. We learned that from Justice Scalia. We learned that from the rules of this court. Okay. Assuming that the court should have let you have multiple options, and assuming that we agree that the court should let you have multiple options, don't those multiple options still have to pass the risk utility analysis? At least one of your multiple options has to pass to have information on risk utility analysis under Louisiana law. Is that correct or not? Absolutely. Okay. Does one of yours pass risk utility? Do you have evidence of that, which should be able to get over the threshold on risk utility analysis? Judge Elrod, it's not one. It's not two. It's not three. It's every single one of them. The Rule 26 reports in this case create a record that is simply not the record we see in the average product liability case. It's hundreds of pages of descriptions. It's hundreds, if not thousands, of pages of references upon which the experts relied. It is photographs of the actual product we describe as a reasonable alternative. It is the use of the alternative design by the defendant in prior years. It is use of the alternative design by competitors at the present time. It is use of the alternative designs in the real world by users, including the GAP, Ford, et cetera. I'm sorry. I just want to pause you on that last point. Can we start with the door? Sure, absolutely.  So I read your two experts as sort of leading with the door, so let's talk about the door. I completely understand how the experts can point to pictures of other forklifts that have doors and say, well, look, that's economically reasonable because it's proof of the fact that you can make a door and put it on a forklift by the fact that other forklifts have doors. That makes perfect sense to me. But how can you say that the door would have averted this injury? By just asserting the fact that other forklifts have doors. The way I read the statute, you have to do both, right? You do have to do both. So how do you do the second one? There's multiple ways we can do this. One is, first off, all of these side stance forklifts are essentially identical. They are substantially similar. If this was an OSI that we commonly see in product liability cases, all of this would come in to some degree to support experts' opinions. But what we do know is that Crown actually sold a door for multiple years. In a side stance forklift where the operator is in identical position, two feet on the floor, left hand in the stew, right hand in the tiller, back against the backrest, an opening in the left foot on a brake that has to be raised on a decelerating forklift so that when the forklift decelerates faster than the human, the foot comes out. We know that we have a perfect safety record, that Crown has a perfect safety record with the hundreds of forklifts that were used, not a single left leg injury. We know that Raymond also sells that door through the present, and as best we are able, as the record reflects, a perfect safety record. So have we done the risk utility? First, we've shown it would have made a difference. Second, we've shown that it does not materially affect the utility of the forklift. The primary utility of a forklift is to pick things up, carry them around, and put them back down. All that can be done with a door. We can show that it doesn't materially affect the price of the forklift. In other words, we can make a forklift that costs $500 million, that was safe for everything. That wouldn't have any utility, of course. But Crown has never raised the cost of a door as the reason. We do show that the cost of this door varies. If you buy them in bulk, it's going to be cheaper. If you make them out of wood, it's going to be cheaper, et cetera. But the point is it's never a material aspect of this to move the price in a way that's going to make this product uncompetitive. No one has ever used that as a reason. So we meet each of the primary things. Was it doable at the time? Yes. Because it had already been done. Was it economically viable? Yes. Did it interfere with the purpose of the product? Absolutely not. And does it save left legs? Absolutely. All of that is firmly in the record. So that, I think, is the door question. Going back to how we interpret these statutes, we go back to what the Louisiana Supreme Court says. It has consistently described the proper technique for interpreting Louisiana statutes. The starting point in the interpretation of any statute is the language of the statute itself. Where the law is clear and unambiguous, as this one is, its application does not lead to absurd consequences. This one does not. The law shall be applied as written. No further interpretation may be made in the search of the intent of the legislature. Louisiana, being a code pleading state, even has a statute on this. When the wording of the section is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit. That's section 1-4 of the Louisiana Code. Now, this is the part I don't understand. The defendant will argue that despite the clarity of the statute, that public policy demands the plaintiff pick just one and that it presents that alternative with infinite detail. It does so without a source or discussion of how it arrives at this public policy that it claims is the backbone of the district court's order. Now, we know that public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. Well, the public does have an interest in having safe products. The public does have an interest in holding defendant manufacturers liable if they produce a product that could have been made safer as defined by the statute. So there's nothing there that just says we want plaintiffs to lose. But words matter. That includes the words in the court's order. What the court said is a specific alternative design. It did not say a design with specificity, although later in the brief it does seem to complain that even if plaintiff had picked one, it failed due to specificity. Counsel, I'm not sure you need to pick just one, but I am a little hung up on the specificity because the way I understand this whole system is supposed to work is that the plaintiff is supposed to come forward and offer to the jury, here is a door. Again, I realize you're not limited to doors, but just to use an illustration. And this is how I would design it. And you need that level of specificity so that you can't just say here's nine doors or 27 doors or whatever. You need to say here's a door that would have fixed it. It would have worked on this forklift. It would have cost this much. So it's not that you're limited to just one, but it is that you need to proffer one with a sufficient level of detail that the jury can go, okay, well this is going to cost $29 and is a man's leg worth $29. You know what I mean? That's kind of the... So when we are going to insert a requirement into the statute, that's a public policy issue, if you will. So where do we go to find out what Louisiana was thinking when they put this fairly simple statute out? The restatement. The restatement is quoted by multiple Louisiana appellate courts as well as treatises that we cite in our brief as the source for the Louisiana Product Liability Act. And if we look there, we see comment D and comment E that are particularly instructive. Comment D says look at competitor's products, just in general. And indeed we have multiple Louisiana cases that we cite where somebody says this was a drill. You could have just picked the competitor's drill. I think it was actually a salt, Your Honor. But the point is they look at other products. A car with no seatbelts. You would look and go, hey, everybody else has got seatbelts. Although that technical is probably a bad example. But the point is the same. But when we look at E, we see a gun that shoots a projectile as a children's toy. They don't say when you describe the water gun and the ping-pong gun and the gun that shoots a soft projectile that you have to say as part of your alternative design how many liters per squirt or how many feet per second. The jury is allowed and is reasonably competent. I believe every student here with a jigsaw and a piece of plywood and a set of hinges from Home Depot could put a door on this forklift. When you show the photograph, it's not complex. When you show changing the pedals and you just switch the software, it's not complex. But the place we really can look to whether or not this is understandable and there was enough detail is not what my esteemed counsel is going to say, nor what the judge wrote. Why don't we look and see what their experts understood? Experts who have been sued. Their 30B6 representative is a man named Ron Grise. His report appears in Appendix 119. He devotes multiple pages to explaining exactly why he disagrees with each and every one of the alternatives that are offered by Dr. Meyer and Dr. Zernicki. At not one point does he say, I don't know what they're talking about. They've actually done testing with doors, which they believe is applicable here. Generic doors. Nobody said, well, it had to be like the old Bill Cosby, make it 30 cubits, 550 cubits, and fill it full of animals. Judge, what do you do with the Scyther case, though, which would tend to say that you need detailed technical drawings? Do you think that, I know it's not the highest court, so it's persuasive not binding on a scenario, but what do we do? Judge Elrod, that's a great question. The Scyther case is so distinguishable, and the reason is this. That was a motor vehicle that is regulated by the Federal Motor Vehicle Safety Act. You just can't say change a car without saying how it complies. That expert really never built anything. He just said put it on a different chassis. But when you look at the opinion, I encourage you to read the opinion, what that expert says is, oh, yeah, it won't hold up this Winnebago thing. So his alternative wouldn't have worked. Our alternatives not only work, we have proof they work from a long historical success record. Good morning, Your Honors. Quentin F. Urca, Jr., on behalf of Crown, the appellee in this matter. Let me begin by stating that Crown has not argued that there should be any insertion of a public policy argument into the statute at play here. Here, the plaintiff does not need to pick just one alternative design. We've never argued that the plaintiff has to pick a unique, distinct alternative design. The plaintiff could pick ten alternative designs if he wants, but each of those must be sufficient to be evaluated under the Louisiana Products Liability Act. That's exactly what Judge Vance held. In this case, the record overwhelmingly shows that the plaintiff failed to produce sufficient evidence to meet his evidentiary burden under the LPLA. The LPLA requires more than simply the presentation of a generalized concept to meet the burden of proof under that statute. Rather, it requires that the claimant present a proposed alternative design that is set forth with a sufficient degree of specificity so that it can be evaluated under the statute. Here, none of the plaintiff's experts committed to any specific alternative design or designs. It doesn't have to be one. None of them would commit to any designs. As such, there was insufficient evidence to do an LPLA evaluation, and Judge Vance correctly dismissed this case on summary judgment. Counsel, your friend on the other side says that forklifts with the summary judgment record in our case shows that forklifts with doors have a 0.0% risk of left-leg amputations. Do you agree with that? No, Your Honor, we don't agree with that because it's an invalid comparison. Counsel pointed out the fact that my client, in fact, made previously, numbers of years ago, 20 years ago, for one special order or two special orders, they put some doors on some of their forklifts because the customer wanted them. It wasn't even an option. It certainly wasn't standard equipment. So a couple hundred doors were manufactured with, excuse me, a couple hundred trucks were manufactured with those doors. For those couple of hundred trucks, were there any problems with those doors? No, there was not. But when you compare that to the hundreds of thousands of doors out there, it's simply not a fair comparison to say, well, there's a 0.0% chance or safety record when you put a door on it. What about your competitors' doors? Same thing, Your Honor. The competitors, there is not a single manufacturer out there right now that offers a door on its lift truck as standard equipment. Why is that true? It's because of safety. It's because the organizations that govern the standards for lift trucks around the world all agree. You should not have doors on stand-up lift trucks because if you have a tip-over accident or you have an off-dock accident, you want the operator of the truck to be able to exit the truck as quickly as possible. Putting a door on that would impede that ability. Therefore, you do not want to have a door. Instead, what you want to do is instruct the operator of the lift truck of the proper way to remain in the truck if they bump into something. But if they're going to tip over, if it's going to go off-dock,  so that they are not seriously injured. So under the LPLA, as counsel said, we start with the statute. And interestingly, counsel did not read the whole statute to you. The statute has three requirements, three. First, it begins by requiring that a claimant must first identify an alternative design for the product that existed at the time it left the manufacturer's control. This basically is a feasibility determination. Can you show that there is a feasible alternative design for an RM6000 lift truck? Second, you must show that this proposed alternative design was capable of preventing the claimant's harm. Third, you must perform a risk utility analysis. And this is critical under the LPLA to be able to do this. Under which, you evaluate the likelihood of harm associated with the product's existing design and the gravity of that harm, which must outweigh the burden on the manufacturer in adopting the proposed alternative design and the adverse effect, if any, on the utility of the product. If the fact finder is not submitted with sufficient evidence to make all three LPLA determinations, then the claimant's proof fails, which is precisely what Judge Vance ruled. And contrary to the assertions of the appellant, the LPLA does require a commitment to a specific alternative design. While the statute doesn't use the word, quote-unquote, specific in its text, the district court correctly reasoned, quote, the LPLA clearly speaks in terms of a specific alternative design. Her position finds direct support in the risk utility analysis set forth in the statute itself, which twice uses the phrase, such alternative design, such alternative design. So what the LPLA requires is you've got the existing design on one hand and you've got their proposed alternative design on the other hand. To be able to make a meaningful comparison, the alternative design needs to be relatively the same degree of specificity as the existing design. You can't reasonably compare a specific existing design against something that's ill-defined out here. That wouldn't be reasonable. It's not fair under the statute. It's not what it requires. I'm sorry to interrupt. I appreciate you marching us through the three requirements, but I'd like to now march through them. Yes. I understand feasibility and capable of preventing the injury, so let's start there. Okay. Does Crown dispute that the alternative design of a door with whatever level of generality the plaintiff has offered, that is feasible and capable of preventing injury? No, Your Honor. We don't necessarily agree that it's feasible. Well, okay, you asked two questions, so let me address both of them. Do we think it's possible to put a door on a lift truck? Of course it is. We've done it. So that's number one. That's number one. So we don't contest that. Would it necessarily have prevented the claimant's injury? We don't know is the answer to that question. And why don't we know it? Because the plaintiff's experts never committed to a specific alternative design for the door. If they had, we could have then evaluated that design. They could have tested the design, which is something they never did. Because what could happen is, depending on the design of that door, its size, its width, its weight, whether it was latched or not, whether it was hinged in a certain way, all those various factors would determine whether it was capable of preventing the harm. Because, for example, if the door wasn't latched and the operator said, you know what, I'm about to hit something, I'm going to stick my foot out, they could swing the door open and stick their foot out anyway. But without a commitment to a design for the door, we don't know whether it would be able to prevent the harm, which is exactly what Judge Vance said here. I'm not going to give this to a jury. They don't have enough information to be able to make the LPLA analysis of whether it's feasible or whether it's capable of preventing the harm. So here, the record, I think, is clear, that none of the plaintiff's experts were willing to commit to any particular design. Instead, they offered general concept of the addition of a door, but as I indicated, no details on size, weight, or any of those other things. Counsel, one thing that's interesting to me is I realize this is not on Daubert and I realize it's not district court. We had Daubert motions pending, Your Honor, and just to be clear about that, and I'll let you go on, the judge here said, I don't need to rule on Daubert. Even if I admit all their evidence in, it's insufficient. But go on, Your Honor. Yeah, exactly. But it's interesting that your defense of the summary judgment order sounds in Daubert. What I'm hearing you say is, well, we didn't have a design, so we couldn't test it. You didn't use the word reliability. I was listening very carefully, but it's implied in the answer, right, which is how in the world am I supposed to know if these experts are, in fact, scientifically reliable if they're not giving me an actual proffered design? Exactly. But I assume you agree that we're not allowed to rule on the Daubert questions that weren't presented by the district court. Well, I agree because the judge never ruled on it. Exactly. So we have to take the reports as they're given. There is a lot of detail in there about different doors. Obviously, they talk about pedals and backrest sensors and other things, but there's a lot in there where we could say, okay, well, we're just going to have to, for the sake of this appeal, presume that they're admitted because they're scientifically reliable. And a jury could look at those doors and say, yeah, that would be the risk utility balance associated with installing that door would be sufficient under the statute. Well, Judge, but there needs to be some degree of specificity in what they're willing to commit to. If they're willing to commit to something so we can make that comparison, then you're putting the jury in an impossible place. And I would not get, I guess, Judge, distracted by the length of the reports that were put together here. If that's true, you're going to start to see experts all over the country just putting page after page after page just because they think a judge might think that's significant. Judge Vance didn't think it was significant. She looked at Mr. Myers, their primary expert on this, 129-page report and said nowhere did he commit to or provide any specifications for any particular door design. He said his analysis was devoid of any technical drawings or calculations. He submitted six different photographs of other doors, but she said, rightfully so, that muddied the water. That didn't clarify things. If you're going to submit six different designs, pick one. Pick one and go with it here. But they wouldn't do it. Why won't they do it? Because these experts testify in cases all over the country against all different manufacturers. As soon as they agree to commit to one, they are sunk. So they won't do it. I'm sorry, Your Honor, you had a question? No, I was going to say, I mean, muddy the water, that sounds like the kind of emotion I would want to entertain under Daubert, right? We don't want this out. There's too much jury confusion here. But if we're not going to do it under Daubert and we're instead going to take the summary judgment record as the parties have presented it, why couldn't a jury say, okay, look, there's obviously ten doors in here, but I would think Crown would have to show that all ten of those doors are going to fail the three factors of the statutory text, right? If we got to that point, Your Honor, and the point here is it's patently unfair to require a manufacturer, Crown or any other manufacturer, to have to defend against ten doors. So basically what the courts would be encouraging at that point is to say, okay, plaintiff, to get to a jury in an LPLA design defect, just throw up against the wall as many different things as you can and let the jury figure out whether any of them will stick or not. And that's not what the LPLA requires. The LPLA says you must come up with such alternative design, not just throwing any things out there. Well, if an expert for the plaintiffs had committed to ten doors, then it's not patently unfair to allow that in, right? If they had committed to ten different doors, if each door design, Your Honor, was sufficiently specific that we could evaluate it, that's true. Right, if they committed to all ten, but they didn't commit to any of them. That's your point. That's the point, Your Honor. They would never choose what door design they were going to go with. They would never choose what pedal design they were going to go with. And I'm not even going to address the backrest sensor. It's not even probably worth this court's time at this point. But they could choose all of them. They could choose all of them. Correct. And they would just have to do the work for all of them. That is exactly correct. It doesn't mean that they choose one as opposed to is better than the others. They could say these are all equal. They're all equally better than what the other side has. That's correct, Your Honor. This is a fiction that's been created by the plaintiffs that Judge Vance required a single exquisite design. Never did she require that. Never did we argue that. We said whatever specific alternative designs you want to propose, you propose them. But each of those specific alternative designs has to be specific enough to meet the criteria of the LPLA, and that's not what happened here. Your friend on the other side uses a really colorful example about NOAA and the ARC and the qubits, the dimensions. Is that what this case actually comes down to, is that the law does require you to show the dimensions of the ARC to actually have designs in order to win under this statute? No, Your Honor, this is a case of sufficiency. It's not a black and white line. I mean, to me, the hardest thing, and I was prepared for this line of questioning about this, is how much specificity does the LPLA require? So you're saying the specifications are not necessarily required? Well, I'm saying that no. Or are they required? I'm saying that some degree of specificity is required, and you have to commit. The dimensions of the door, are those required? Yes, Your Honor, because if you don't decide how the door is going to fit in this lift truck, you can't then evaluate whether or not the risk presented by the alternative design would be capable, or the risk presented might be greater than the risk with the existing design. You've got to be able to do the comparison, and unless you give us some specifics to be able to do that comparison, we can't do it as a manufacturer. It's the proverbial moving target. If we as a manufacturer say, okay, you've talked about doors, but you haven't given us anything, let us guess what you think you mean, okay? And so we then guess. Well, the next thing the plaintiff's experts do is say, well, no, you guessed wrong. All the while they won't commit to one design. That's patently unfair. It's exactly what Judge Vance noted. And in particular, she noted this court's opinion in the Guy v. Crown Equipment Company case, where this court said when plaintiff's design experts do not reach any concrete conclusions about the best design alternative and never specify which design they plan to support at trial, the manufacturer is deprived of sufficient opportunity before trial to prepare a reply to the proposed opinions. Exactly the unfairness here. That was followed by the Peterson v. Raymond case, another lift truck case from the Tenth Circuit, in which the Tenth Circuit said a jury cannot compare the existing design to essentially anything and everything. That's what I'm hearing, anything and everything. Hey, guys, you figure it out. It's not what the LPLA or products liability law in general requires. The Tenth Circuit went on, and this is a great quote, by not committing, plaintiff's expert made it impossible to compare the benefits and risks of any phantom design made of unknown materials attached in unknown ways with unknown safety and performance effects at an unknown cost to the existing design. Exactly the same unfairness here. Your Honor, to wrap up, I would just note that the decision by Crown here not to put a door on this lift truck was a conscious one. Crown has been evaluating doors on its lift trucks for over 40 years. Crown made a conscious choice here not to put a door on its lift trucks, and that is backed up by ANSI standards, by OSHA standards, and it's also backed up by the marketplace. Not a single other manufacturer of stand-up lift trucks puts a door on their lift trucks as standard equipment. In fact, you know who the only people are who are advocating for doors on stand-up lift trucks? The experts who are being paid by the plaintiffs who bring these cases. That is it. Your Honors, in conclusion, we believe that Judge Vance engaged in a thorough, well-reasoned, and detailed analysis of the LPLA. Based on that analysis, she correctly concluded the plaintiff was required to present more than generalized design concepts in meeting his burden. Without sufficient specificity in the proposed alternative designs, the jury in this case could not make the required assessment of the LPLA. The decision of the District Court in granting summary judgment was correct and should be affirmed in all respects. I know I have two minutes left, but I'm not going to use it unless the Court has further questions, which they happen to have. Hearing none, I will sit down. Thank you very much. He had a minute and 40 seconds. I'll be glad to take those from him. I don't think it works that way. Well, Judge, one never knows. Who are the advocates for a door? How about the 900 men and women of this country who have had serious left leg crush injuries using crown sidestand forklifts? I think they are the advocates for this change. You know, the entire asbestos industry and the entire cigarette industry at one time said their products were safe too. That doesn't make it right. The defendant's argument is the argument of someone, of an entity, that is desperate. First it says, we're not arguing public policy, but yet on page 24 of its brief, significantly there are important policy reasons. Can you point us in the record where one of the plaintiff's experts said, I say this design is a good alternative design? I would submit, Judge Richmond, that throughout Dr. Zernicki's report and throughout Dr. Meyer's report, they have identified designs, each of which is supported through and through. The defendant says, on the one hand, multiple are okay. That has to be the law. They have to say that. Anything else would be crazy. The majority rule, when we're looking at what this statute must mean, we look at the restatement where it clearly allows multiple alternatives. We look at every state in America that allows it. What's the record site where I can go look at it? You could have pointed to Judge Vance and convinced her that our expert says here that we'll go with this design, we'll go with these five, we'll go with these ten. We said over and over we'd go with each of them. We said over and over that each and every one of them is fully developed. We were not required by Louisiana law to pick one. The defendant says as much, but in the next breath cites Guy, and the quote in Guy says they must choose a best design. Did you pick them all? I don't understand what you just said. If you said they all worked, then you picked them all. We picked them all, absolutely. Where in the record can you show me that I can go read it that says we picked them all? If we read Dr. Meyer's report, you will see that he says a door, regardless of its design, latched, unlatched, magnetically latched, interlocked, or spring-loaded, would have provided the essential attributes of the safety feature, which is a visible reminder, a tactile reminder, and a physical barrier. Each of those doors met that requirement. He describes how the crown door had a history of perfection with respect to stopping this kind of injury. Do you have a particular citation to the report? In our brief, we do page and line over and over and over, Judge Elrod. Okay. I just was curious. I do believe that we have done that. In our brief, we actually incorporate pictures of the multiple doors that we say would have worked. In our brief, we do the same with the pedal. In our brief, we do the same with the alternative, the forklift. In our brief, we describe the backrest. But they say it's unfair unless there's one design. They rely on Guy and Peterson in a misleading way. Judge Oldham, you pointed out this isn't a Daubert decision. Both of those, the evidence had been struck. The standard of review was abuse of discretion. The standard of review here is de novo. And what's critical about that is the defendant recognizes it's de novo and then discourages there is no need to revisit the expert evidence presented by Valley. In other words, hey, court, we know you have a de novo obligation here, but don't do it. Because if you do, you will find that everything the plaintiff says is a reasonable alternative. Counsel, do you agree that as part of the risk utility burden on the plaintiff that you have to show, obviously, one, that the door would have prevented this injury, that's obvious, but two, that the door wouldn't have created other safety problems? We address every potential safety problem. You know, what they've done is make great jury arguments. We put up a case that off-docs don't happen very often. It's like the fellow who won't wear a seatbelt because he hurt his neighbor's friend, drove into a pond and couldn't get out. Yeah, maybe seatbelts make it unsafe if that weird event happens. Off-docs are just as rare. At this particular location, they're not only rare, this was a custom-built product, which means we measure it as it was delivered to this location. We have case law on that in our briefs. This location, it was impossible to happen. With respect to this being some sort of unique machine, the part that we're here about is the occupant compartment. It's substantially similar, if not identical. Two feet on the ground, left arm, right arm, open compartment. The only thing that makes this RM6000 unique is it has a monomask. That's four and a half feet away from the operator. Everything else is identical, and therefore all of the historical things that we rely on as proof of the concept and usability of our alternative designs are relevant, admissible, and will require this court to reverse. Thank you for your time, Donna. Thanks. And thank you, student, for being with us. Thank you, Your Honor.